342 So.2d 339 (1977)
CITY OF HUEYTOWN, a Municipal Corporation
v.
H. S. BURGE et al.
SC 1666.
Supreme Court of Alabama.
January 14, 1977.
Rehearing Denied February 25, 1977.
*341 James H. Weaver, Jr., Birmingham, for appellant.
Ralph L. Armstrong, Bessemer, for appellees.
Drayton N. Hamilton, Montgomery, for Ala. League of Municipalities, amicus curiae.
BEATTY, Justice.
This is an appeal from a decision of the Circuit Court of Jefferson County, Bessemer Division, holding that certain municipal ordinances of the City of Hueytown were void as applied to appellees and members of their class, and enjoining the city from collecting taxes or fees under those ordinances from members of that class. We modify and affirm.
The plaintiffs filed a complaint against the City of Hueytown in Jefferson Circuit Court, Bessemer Division, alleging that they were representatives of a class of merchants whose businesses were located outside Hueytown's city limits but within its police jurisdiction. The Court was asked to render the following relief:
1. To declare that Hueytown's Ordinances 3-J and 209 are unconstitutional, illegal and invalid as applied to the plaintiffs and others similarly situated;
2. To suspend the operation of those ordinances against plaintiffs and others similarly situated;
3. To declare that Ordinance 209 is unenforceable and uncollectible respecting sales made outside the City of Hueytown;
4. To determine that refunds should be made to the plaintiffs, attorneys fees and other costs to be paid, and equitable relief, if any, be awarded plaintiffs.
We quote pertinent parts of Ordinances 3-J and 209:
Ordinance No. 3-J

Section 9. That the schedule of license for the year beginning October 1st, 1973 required to be paid to the City of Hueytown for engaging in or carrying on businesses, occupations, or professions, without said City but within the police jurisdiction thereof, is hereby declared to be one-half the amount required for engaging in or carrying on such businesses, occupations or professions within the City of Hueytown.
Ordinance No. 209:

Levy of Tax in Police Jurisdiction. There is hereby levied, in addition to all taxes of every kind now imposed by law,. . . a privilege or license tax against the persons on account of the business activities . . . as follows:
(a) Upon every person engaged or continuing, within the police jurisdiection of the city and beyond the corporate limits thereof, in the business of selling at retail any tangible personal property whatsoever, including merchandise and commodities of every kind and character . . .
(b) . . . operating places of amusement or entertainment, billiard and pool rooms, bowling alleys, amusements devices, musical devices, theaters, opera houses, moving picture shows, . . .
(c) . . . selling at retail machines used in mining, quarrying, compounding, processing and manufacturing of tangible personal property, . . .
(d) . . . selling at retail any automotive vehicle, truck trailer, semitrailer or house trailer, . . .
Following the trial, the lower court awarded plaintiffs' relief, holding:
1. That Ordinances 3-J and 209 were void and of illegal effect as applied to plaintiffs and all other merchants similarly situated;
*342 2. That operation of such ordinances was suspended as applied to plaintiffs and all other merchants similarly situated;
3. That the City of Hueytown was permanently enjoined from interfering with the plaintiffs and all other merchants similarly situated in reference to collection of tax or fees imposed by such ordinances.
The City of Hueytown appeals from this order, citing Alabama Code, Tit. 37, § 733 (Recomp.1958) as authority for their position:
"Any city or town within the state of Alabama may fix and collect licenses for any business, trade or profession done within the police jurisdiction of such city or town but outside the corporate limits thereof; provided, however, that the amount of such licenses shall not be more than one-half the amount charged and collected as a license for like business, trade or profession done within the corporate limits of such city or town, fees and penalties excluded. Provided, further, that when the place at which any such business, trade or profession is done or carried on within the police jurisdiction of two or more municipalities which levy the licenses thereon authorized by this section, such licenses paid to and collected by that municipality only whose boundary measured to the nearest point thereof is closest to such business, trade or profession. Provided that this section shall not have the effect to repeal or modify the limitations in this article relating to railroad, express companies, sleeping car companies, telegraph companies, telephone companies and public utilities, and insurance companies and their agents."
The quoted statute allows a municipality to assess a license tax against businesses located outside the corporate limits of the municipality but within the police jurisdiction in order to reasonably reimburse the city for supervision of the businesses so located, including police and fire protection. Atlantic Oil Company v. Town of Steele, 283 Ala. 56, 214 So.2d 331 (1968); City of Homewood v. Wofford Oil Company, 232 Ala. 634, 169 So. 288 (1936). When such an assessment occurs it is presumed to be a valid exercise of the police power of a municipality unless it is shown that the city has manifestly abused its power or invalidity appears from the face of the ordinance itself. Atlantic Oil Company v. Town of Steele, supra; City of Andalusia v. Fletcher, 240 Ala. 110, 198 So. 64 (1940).
Our authorities have placed the burden on the challenger to establish affirmatively by competent evidence that abuse or invalidity exists, Franks v. City of Jasper, 259 Ala. 641, 68 So.2d 306 (1953); City of Andalusia v. Fletcher, supra. Although these tax levies may not be imposed as a source of general revenue, Alabama Power Company v. City of Carbon Hill, 234 Ala. 489, 175 So. 289 (1937), the presumption that the ordinances are valid exercises of the municipality's police power, as we have indicated, requires that the challenger go forward with competent evidence that the city has imposed an illegal tax.
By stipulation, documents relating the operating expenses for the police and fire departments, together with records of the revenues received from business licenses and sales tax licenses, were admitted into evidence. Also admitted were a listing of licenses issued in the police jurisdiction for the years 1969-73 and a recapitulation of license tax collections for the years 1969-73 and a part of 1974.
Several witnesses testified for the plaintiff expressing various complaints concerning the inadequacy of protective services outside the city limits but within the police jurisdiction. Each of these witnesses paid business license and sales taxes to the City of Hueytown.
The license and sales tax revenue figures for police jurisdiction businesses are revealing. When compared with general revenue receipts they show:

*343
 1969 1970 1971
General license revenue $62,010.95 $73,224.95 $79,460.77
General sales tax revenue 39,576.98 64,232.92 69,093.00
Police jurisdiction
 licenses 1,953.10 2,215.54 5,054.05
Police jurisdiction
 sales taxes 3,627.05 4,566.54 2,046.05
 1972 1973
 $94,230.80 $103,781.28
 90,050.39 102,861.00
 4,342.78 4,989.72
 1,865.27 2,105.47

On the other hand, general operating expenses for the fire and police departments during the same period were:

 1969 1970 1971 1972 1973
 $101,524.61 $111,944.53 $135,948.50 $161,536.70 $191,101.94

Obviously, the receipts from business licenses and sales tax collections from in-city sources far exceed those from police jurisdiction businesses, but this fact does not make legal the taxes imposed on the latter. Not only do the police and fire department expense records themselves fail to distinguish between in-city and police jurisdiction services, but the testimony of the mayor and the fire and police department heads establishes as a fact that in projecting their budgetary requirements no consideration has been given to the differences between the cost of rendering services to police jurisdiction businesses and those offered to others. The fire chief testified that it cost the city $158.83 for each fire call answered; however, this figure was an average based upon all such calls, whether inside or outside the city. On the question regarding cost allocation between such calls he testified:
Q. In this 1972 budget, how much of this budget did you set aside or how much of this budget is allocated to the cost of your supervision of those visits outside of the city?
A. It's all mixed up with the ones in the city.
Q. There's no separate account to supervise these businesses outside of the city limits?
A. No, sir, it's all mixed up.
Q. Now, the budget for the year 1973, it was the same way as 1972?
A. The same amount of money?
Q. No, but it was the same regarding about not allocating anything outside, but all mixed up, no billing out by the city of your department ahead of time as to what the cost is going to be or the estimate is going to be to supervise those businesses, just all lumped in together, is that correct?
A. That's correct.
He also testified that usually at the end of the year he would prepare a report of the in (city) and out calls for the information of the mayor and council, but he did not furnish them with any other statistics, and at budget hearings did not ask the council to make allocations for inside and outside operations.
The testimony of the police chief established the number of complaint calls and investigations inside and outside the city, the size of his staff, and the nature of the supervision extended. But on the subject of cost allocation this exchange occurred:
Q. Did you take into consideration all or did the City of Hueytown take into consideration how much it would cost to supervise those business establishments *344 outside of the city limits but within the police jurisdiction?
A. No, it was all submitted as a whole for the jurisdiction and the city limits too.
The mayor testified that revenue derived from these ordinances went into the general fund, after which he stated:
Q. Do you all have a meeting out there in the City of Hueytown with the other city officials to attempt to allocate to the budget how much it's going to cost or supervise those businesses as far as fire and police protection outside of the police jurisdiction?
A. Which do you mean?
Q. Do you and other city employees or officials get together at a budget meeting and attempt in any way to ascertain or project how much it's going to cost the City of Hueytown to provide police and fire protection to the merchants out there from whom you derive revenue?
A. As I stated before, this is a whole thing, it's not broken down. We do not in that sense meet and do things like that.
Q. You don't have any earthly idea how much it cost to police or give fire protection or supervise those businesses out there?
A. No.

* * * * * *
He also testified:
Q. . . . So, it's my understanding, Mayor Jackson, that expenditures are made from the general fund to provide sanitation and garbage service to the residents of the City of Hueytown but not to the people who live outside of the city, but who pay half license? (Emphasis supplied.)

A. That's correct.
And later:
Q. Let me ask you this, how do you arrive at that half license, Mayor?
A. I don't think I can give you an intelligent answer on that. This has been in effect for many[,] many years, I think.
On the record we are convinced that the trial court was imminently correct in its order enjoining enforcement of these ordinances against these plaintiffs since it clearly appears that the city's decision to tax them was an arbitrary one, affirmatively shown to be based upon no effort to relate the fees to the reasonable cost of supervision. No such effort having been shown, it follows that the imposition of the taxes on police jurisdiction businesses was for general revenue purposes, an impermissible course of municipal action. Hawkins v. City of Prichard, 249 Ala. 234, 30 So.2d 659 (1947); Tit. 37, § 733, Ala.Code.
Although this complaint originally was filed as a class action, which the defendant city denied in its answer, apparently no evidence was offered on the question nor did the trial court make an order determining whether the action should be so maintained as it is required to do under Rule 23, ARCP. This is necessary for reasons of notice to possible class members and ultimately to allow conformity with the requirements of the judgment under Rule 23(c)(3). There having been no such determination and order, the only parties-plaintiff before the Court were the individuals so named, and the judgment could extend only to them. It appears that none of the parties was prejudiced by the failure to make the class action determination, and none is claimed. Even so, that portion of the decree applicable to "all other merchants whose businesses are located within the police jurisdiction of the City of Hueytown, Alabama, but outside the corporate boundaries of the said City" is due to be stricken, and it is so ordered.

AFFIRMED AS MODIFIED.
FAULKNER, JONES, ALMON and EMBRY, JJ., and FRANK B. EMBRY, Supernumerary Circuit Judge, sitting by designation of the Chief Justice, concur.
BLOODWORTH, MADDOX and SHORES, JJ., dissent.
MADDOX, Justice (dissenting).
The majority opinion concedes that an assessment such as here involved is presumed *345 to be valid and that the burden is on the challenger to show that the City has manifestly abused its power or that the ordinance is void on its face. Nevertheless, the majority holds, in effect, that the challenger sustained his burden in this case by showing that the City "in projecting their budgetary requirements no consideration has been given to the differences between the cost of rendering services to police jurisdiction businesses and those offered to others." The majority does not hold that the amount of the tax as a police measure was so much out of proportion to what was reasonable in relation to the challenger's business, "as to show that it is a subterfuge to raise revenue." Cf. Alabama Power Co. v. City of Carbon Hill, 234 Ala. 489, 175 So. 289 (1937).
The majority holds that "the city's decision to tax them was an arbitrary one, affirmatively shown to be based upon no effort to relate the fees to the reasonable cost of supervision." The majority then concludes: "No such effort having been shown, it follows that the imposition of the taxes on police jurisdiction businesses was for general revenue purposes, an impermissible cause of municipal action. Hawkins v. City of Prichard, 249 Ala. 234, 30 So.2d 659 (1947); Tit. 37, § 733, Ala.Code."
In Hawkins, the mayor there testified that they were collecting "from these people outside the city limits money for use of the general welfare of everybody." 249 Ala. at 239, 30 So.2d at 663.
In fact, in Hawkins, the "revenue from licenses on filling stations paid the entire cost of the fire and police departments, for those years, when combined, with some left over for other purposes." (Emphasis added). Here, the evidence is undisputed, and the majority has conveniently set out in its opinion, that the total receipts from licenses and sales tax in the police jurisdiction represented a small portion of the operating expenses, not to mention capital expenditures, of the police and fire departments. Furthermore, there was evidence presented which showed that the City Council had available to it the total number of police calls and fire calls both in and out of the city. It was uncontradicted that the City, during the period 1969-1973, made 593 calls within the city and 158 calls out of the city. During the period 1969-1973, the City made 953 rescue calls in the city and 93 out of the city.
The police chief testified, as follows:
"Q Chief, do you keep certain log books and records and all complaints and other types of calls that come into the city, or do others at your direction and employed in your department make entires into such logs?
"A Yes, sir, there's a daily report made every day by each policeman pulling his duty, including the Chief of Police, and reviewed by me every day.
"Q Do you monthly make a summary report as given to the council as reflecting those calls?
"A I make a monthly report on the first day of each month to the Mayor and City Council, the number of arrests and complaint calls, the number of burglaries and every other means that come to the police department. I submit it to them and make a yearly report at the end of the year. We have to make a report to the FBI each month too."
He also testified that he answered all calls both within and outside the city, and prepared a detailed report which showed the number of calls to businesses located within the police jurisdiction which showed a substantial number of calls to businesses, including several to "C&G Foodland," owned by one of the challengers. The Chief also testified as follows:
"Q Now, Chief, you also prepare an annual budget for the council each year?
"A Yes, sir.
"Q In preparing that budget, do you take into account your prior year's expenses as to the money and duties and requirements as to your department?
"A Yes, if I have an additional expense, more territory added, you have to judge what it will cost to take care of it and submit it to the council for they're (sic) approval.

*346 "Q You have nothing to do as to whether they approve it or not?
"A No, sir."
It is undisputed that adequate records are kept by the City to show that the license tax imposed was not out of proportion to the supervision required.
The trial court made no findings of fact. It merely held that the ordinances "are hereby declared void and of illegal effect." I think the trial court erred in determining that the levies were illegal. The guidelines for making the legal determination are set out in Hawkins, relied on so strongly by the majority. In Hawkins, it is said:
"[C]ities are not authorized under the Constitution to levy a license tax on business located wholly within its police jurisdiction and outside the city limits for the purpose of raising general revenue either directly or indirectly; but in levying such an assessment, the amount must be so fixed as to reflect reasonable compensation for the expense of municipal supervision over the particular business or vocation at the place where it is licensed.
. . . . .
"The supervision here referred to properly includes services of the police and fire departments, including standby facilities, sanitary inspectors, and such other employees as may be necessary to see that reasonable requirements are observed with respect to disorders, fires, sanitation, and safety in other respects, of each such business in its relation to all of the businesses within such territory.
"But the action of the municipality in fixing an amount which appears to be a fee for such purposes will not be disturbed by the courts unless it is manifest that it was not based upon a proper consideration of the power and duty which the city owes under such circumstances, but is intended as a subterfuge to raise revenue on a broad basis, and the courts will not scrutinize the amount of the license fee too narrowly when it can be reasonably found to be predicated upon a sincere effort on the part of the city authorities to fix the fee on a basis which is justified under the Constitution.
"It is also here important to note that `when the unreasonableness vel non of an ordinance or by-law is asserted or urged, the question thus made is to be decided by the court, not by the jury.' City of Andalusia v. Fletcher, supra [240 Ala. 110, 198 So. 64; Briggs v. Birmingham Ry., Light & Power Co., 188 Ala. 262, 66 So. 95; City of Birmingham v. Louisville & N.R. Co., 216 Ala. 178, 112 So. 742."
I believe the uncontradicted evidence shows that the City made "a sincere effort," as Justice Foster wrote in Hawkins, to predicate its tax upon a constitutional basis. Plaintiff Burge, probably without realizing it, testified to this sincerity. He stated that when complaints were made, the Mayor said "that the City of Hueytown was not in the business to make money but to sell services."
The record, in this case, in my opinion may show that Hueytown is losing money in furnishing services to the police jurisdiction. For instance, the police chief, as the majority concedes, testified that it cost the City $158.83 to make a fire call, and this did not include capital expenditures. The record is clear that 158 fire calls were made in the police jurisdiction between 1969-1973. Multiply 158 calls by $158.83 and the total is $25,095.14. The total amount collected by Hueytown from licenses and sales taxes between 1969-1973, was only $32,765.57. In other words, it cost Hueytown $25,095.14 of the $32,765.57 just to provide fire protection services (not including capital expenditures) in the police jurisdiction. The 93 rescue calls and 157 police calls shown by the record to have been made during the five-year period were provided by Hueytown, and it got $7,670.43 in exchange.
The record itself shows, in my opinion, that the ordinances were reasonable.
BLOODWORTH and SHORES, JJ., concur.