THOMAS, Judge.
Dickson Campers, Inc., sells campers and camper supplies at its place of business located outside the corporate limits of the City of Mobile but within the City’s police jurisdiction. On January 17, 2003, Dixon Campers filed a class-action complaint against the City, alleging that it was a representative of a class of businesses operating in the City’s police jurisdiction whose members, for the preceding two years, had paid both the City’s annual business-license taxes and the City’s monthly gross-receipts privilege or license taxes. Dickson Campers sought a judgment declaring the taxes illegal, an injunction against further collection of the taxes, a refund of taxes paid, and other relief, including costs and an attorney fee.
Following discovery and an evidentiary hearing on the issue of class certification, the trial court granted Dickson Campers’ motion for class certification with respect to those entities that had paid the annual business-license taxes but denied class certification with respect to the entities that had paid the monthly privilege or license taxes. The trial court held:
“Dickson Campers, as well as most other potential class members, pass[es] [the monthly gross-receipts] tax[es] on to the consumer. The Court finds that Dickson Campers does not have standing to proceed with a certification for a class consisting of business entities which paid these monthly gross receipts taxes. In addition, Dickson Campers’ claims are not typical of the class and its interests may conflict with other potential class members who may not have passed on the [monthly gross-receipts] tax[es] on a regular basis.”
Dixon Campers moved the court to reconsider its partial denial of class certifica *137 tion; the court never ruled on that motion.[1] The parties filed cross-motions for a summary judgment on the issue whether the City violated § 11-51-91, Ala.Code 1975, when it imposed annual business-license taxes on the businesses operating in the City’s police jurisdiction. The trial court denied Dickson Campers’ motion, granted the City’s motion, and entered a summary judgment for the City without specifying the basis for its decision. Dickson Campers appealed to the Alabama Supreme Court, which transferred the appeal to this court pursuant to § 12-2-7(6), Ala. Code 1975.
Dickson Campers presents two issues on appeal: (1) whether the trial court erred in determining that the City had not violated § 11-51-91 when it imposed annual business-license taxes on businesses in the City’s police jurisdiction; and (2) whether the trial court erred by refusing to certify a class of businesses on which the City had imposed monthly gross-receipts privilege or license taxes.
Section 11-51-91 gives a municipality the authority to impose license fees or taxes on businesses located outside the corporate limits of the municipality but within the municipality’s police jurisdiction. That section, as it read before it was amended in 2006, provided, in pertinent part:
“Any city or town within the State of Alabama may fix and collect licenses for any business, trade or profession done within the police jurisdiction of such city or town but outside the corporate limits thereof; provided, that the amount of such licenses shall not be more than one half the amount charged and collected as a license for like business, trade or profession done within the corporate limits of such city or town, fees and penalties excluded; and provided further, that the total amount of such licenses shall not be in an amount greater than the cost of services provided by the city or• town within the police jurisdiction
(Emphasis added.) Section 11-51-91 authorizes a municipality to collect license fees or taxes from businesses located within its police jurisdiction in order to defray the cost of providing municipal services in the police jurisdiction. State Dep’t of Revenue v. Reynolds Metals Co., 541 So.2d 524 (Ala.1988). “Alabama case law has consistently held that a city may levy a license tax upon a business in its police jurisdiction so long as it is not for the purpose of raising general revenue.” Ex parte City of Leeds, 473 So.2d 1060, 1061 (Ala.1985), overruled on other grounds by Ex parte City of Robertsdale, 538 So.2d 31 (Ala.1988), and State Department of Revenue v. Reynolds Metals Co., supra. The amount of the tax must reflect reasonable compensation to the municipality for the expense of exercising supervision over the police jurisdiction. The tax must do no more than allow the municipality to recoup the cost of extending municipal services to the inhabitants of the police jurisdiction; the tax may not be for the purpose of raising general revenue. Id. See generally Holt Civic Club v. City of Tuscaloosa, 439 U.S. 60, 74, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978)(holding that it was not unreasonable “for the Alabama Legislature to require police jurisdiction residents to contribute through license fees to the expense of services provided them by the city. The statutory limitation on license fees to half the amount exacted within the city assures *138 that police jurisdiction residents will not be victimized by the city government.”).
Pursuant to the authority of § 11-51-91, the City enacted a number of ordinances imposing business-license taxes and license or privilege taxes upon businesses operating in the City’s police jurisdiction. Mobile Municipal Code § 34-41 (1997) imposed an annual business-license tax, equal to one-half the annual business-license tax paid by similar businesses located within the corporate limits of the City, on every business in the police jurisdiction. The trial court found that none of the approximately 2000 class members had passed on the annual business-license tax to its customers; all had paid the tax as a cost of doing business. Dixon Campers has paid the annual business-license tax since 2001.
The City also imposed a variety of monthly privilege or license taxes on businesses operating in the police jurisdiction, including a monthly gross-receipts tax on retail sales, Mobile Municipal Code § 34-042 (1997). Dixon Campers paid the monthly gross-receipts tax from 2001 to October 1, 2003.[2] Section 5.1(B) of the ordinance imposing the monthly gross-receipts tax provides that
“on or before the 20th day of each month, every person subject to the taxes levied by this code shall render to the City a sworn tax return, on a form provided by the Revenue Director, and the taxpayer shall compute the taxes due and shall pay to the City the amount of taxes shown to be due.”
Section 5.1(E) of the ordinance imposing the monthly gross-receipts tax provides:
“All persons subject to the provisions of this ordinance may add the tax herein levied to the sales price of the goods sold and collect the same from the purchasers, but this section is not mandatory”
Section 6.1 of the ordinance provides civil and criminal penalties for noncompliance. Dixon Campers added the amount of the gross-receipts tax to the cost of the goods it sold and collected from its customers the amount of the tax. The trial court found that most, but not all, of the businesses operating in the police jurisdiction had, like Dixon Campers, passed on to their customers this tax, as well as the other monthly taxes imposed by the City.
Other monthly privilege or license taxes imposed on businesses in the police jurisdiction included a tax on leasing tangible property, Mobile Municipal Code § 34-084 (1994); a liquor tax, Mobile Municipal Code § 34-068 (1992); a lodging tax, Mobile Municipal Code § 34-076 (1987); a gasoline tax, Mobile Municipal Code § 57-093 (1987); a cigarette tax, Mobile Municipal Code § 34-090 (1983); and a tax on deliveries, Mobile Municipal Code § 34-068 (1983). Dixon Campers did not pay any of those taxes.
Mobile has a mayor-council form of government. Each year, the mayor develops an annual budget and submits it to the city council for approval. Michael C. Dow, who was the mayor during the time at issue in this case, testified by deposition that during his tenure as mayor the City budgets had never separately reflected the sums expended by the City to provide services in the police jurisdiction. Mayor Dow acknowledged that there were no line items in the budget indicating what the City projected it would spend in providing ser *139 vices in the police jurisdiction. He stated that the cost of providing those services was simply one part of “the totality of the budgeting process.” The mayor said that, although the cost of the services the City rendered to the police jurisdiction had never been isolated or specifically allocated during the budgeting process, he was aware that state law required a municipality to see that “service levels” in the police jurisdiction were “up to” the revenue received from the police jurisdiction. He testified, however, that he knew of no state law that either dictated how a municipality was to manage the expense-to-revenue ratio or required a municipality to “keep a record” documenting the relationship between expenses and revenue.
Mayor Dow testified that in 1991 the State of Alabama had conducted an audit of City operations and had determined that the City had spent more that year to provide services in the police jurisdiction than it had received in revenue from the police jurisdiction. The mayor stated that he determined that, if he “kept putting more, percentage-wise” each year into services in the police jurisdiction, he would be “in line with” the formula approved by the State auditor. Mayor Dow said that he had added more each year for police-jurisdiction services, including dedicated police patrols, new fire stations, and improved facilities. He testified that the City had bought land for a service center and had opened a youth center in the police jurisdiction.
Mayor Dow acknowledged that he knew at all times exactly how much revenue the City was receiving from the police jurisdiction. Counsel for Dixon Campers asked the mayor how, in the absence of budgetary projections as to the cost of the services provided in the police jurisdiction, the mayor could be sure that revenues did not exceed expenses. Mayor Dow replied:
“A. Well, my understanding again was that we applied more and more services to the [police jurisdiction] as time went by to compensate for [the increase in business-license and privilege taxes]. We gave [the residents of the police jurisdiction], I think, their money’s worth.
“Q. You said, ‘I think.’ That’s my point. How did you know?
“A. I might have been spending too much.
“Q. How do you know that? That’s my point. How do you know for a fact whether the City was spending too much or too little in the police jurisdiction if you didn’t run the calculation to compare the income versus the expenses?
“A. We had done those calculations in prior years. And when your philosophy is to spend more, you don’t worry if you’re spending less. You know you’re spending more. And so we tried constantly to keep our expenditures [in the police jurisdiction] increasing as time went by to provide more and more services. And that was the executive yardstick that I used to guide the City.”
Barbara Malkove, the City finance director, testified that she had never seen a dollar value placed on the amount the City had spent to provide services in the police jurisdiction. Robert Young, the City budget officer, testified that he had never been asked to make a comparison of the City’s income from the police jurisdiction with the City’s expenditures in the police jurisdiction. Reggie Copeland, Sr., the president of the Mobile City Council, stated that he had never seen any calculation concerning the relationship between tax revenue from the police jurisdiction and City expenditures in the police jurisdiction.
The City hired Dr. G. Richard Thompson, a Clemson University economics professor, to make an after-the-fact as *140 sessment for the purpose of the current litigation of what the City had spent on providing services to the police jurisdiction from 2001 to 2003. Dr. Thompson used the City budgets, the City’s annual financial reports, population and service statistics, and principles of cost accounting to arrive at the amount the City had spent for rendering services in the police jurisdiction.
Dr. Thompson used population statistics to allocate the police-jurisdiction portion of total costs for a number of municipal services. He calculated that the population within the police jurisdiction was 28.08% of the population within the City limits. Accordingly, he multiplied the City’s total expenses for various items, such as the City Clerk’s office, by 23.08% to arrive at the expense that could be ascribed to the police jurisdiction. For other City services, such as police and fire protection, Dr. Thompson allocated the City’s expenditures somewhat more precisely. He determined, for example, that 16.88% of all law-enforcement responses to calls were made in the police jurisdiction; accordingly, he multiplied the total police-department expense by 16.88% to arrive at the sum representing the expense attributable to the police jurisdiction.
Dr. Thompson acknowledged that the cost-accounting methods he used were inexact and might even, he said, have resulted in allocations that underestimated what it cost the City to provide municipal services in the police jurisdiction. For example, he testified:
“I used to live in Mobile, so I am somewhat familiar with the area. It would seem to me that it would actually be more costly, particularly if the police were based within the City and had to go out into the police jurisdiction. I don’t know what percentage of that there was. It would be more costly to answer a call to the police jurisdiction than it would in the City. I didn’t have that data, so I didn’t even address that issue.... [Mjaybe I am underestimating the numbers here and ... maybe the cost should be more.... ”
Dr. Thompson testified that it was virtually impossible for the City to estimate the cost of many of the municipal services it provided in the police jurisdiction. For fire and police protection, he said, the City would have no idea from day to day how many calls were going to be in the police jurisdiction. He continued, “So how do you estimate this in the future? You can only do what I did and estimate [the future expenses based on what] the past [expenses have been].”
Dr. Thompson’s calculations resulted in the following assessments of the total cost of services provided in the police jurisdiction for 2001, 2002, and 2003:
2001 .$19,740,685
2002 .$21,055,311
2003 .$20,618,981
The evidence was undisputed that the revenues received by the City from the police jurisdiction for the same years were:
Monthly Business-License Revenue Total Revenue Received From Police Jurisdiction Annual Business-Year License Revenue
$15,604,525 = $17,685,761 2001 $2,081,236 +
$19,175,750 = $21,264,402 2002 $2,088,652 +
$18,548,516 = $20,970,887s 2003 $2,422,371 [3]
*141 I. The Propriety of the Summary Judgment in Favor of the City
On appeal, Dixon Campers argues that the annual business-license tax is invalid because, before enacting the ordinances that imposed the tax, the City made no effort to estimate the cost of the services it provided to the police jurisdiction, thereby failing, according to Dixon Campers, to establish the justification for the tax. Citing State Department of Revenue v. Reynolds Metals Co., supra, as well as Town of Eclectic v. Mays, 547 So.2d 96 (Ala.1989); City of Hueytown v. Burge, 342 So.2d 339, 344 (Ala.1977), overruled in part by Reynolds Metals; and State Department of Revenue v. Taft Coal Sales & Associates, Inc., 801 So.2d 838 (Ala.Civ.App.2001), Dixon Campers asserts that an ordinance levying license and privilege taxes in the police jurisdiction must be preceded by an estimate of the City’s expenses in the police jurisdiction so as to ensure that the ordinance is not for the purpose of raising general revenue.
In Reynolds Metals, the supreme court expressly overruled Ex parte City of Leeds, supra, and partially overruled other prior cases that had held or implied “that a municipality must be able to relate the license fee levied upon a particular business within the police jurisdiction ... to the cost of city supervision and services rendered in the past to that business.” 541 So.2d at 532 (emphasis added). The court announced the following standard to be applied to cases arising under § 11 — 51— 91:
“A municipality must estimate the amount reasonably necessary to provide for the protection of the lives, health, and property of businesses and residents, and for the maintenance of good order and the preservation of public morals within its entire police jurisdiction. The municipality may then, by a properly adopted ordinance or resolution, set a license fee for businesses within its police jurisdiction, but outside its city limits, so that the total receipts from all such licenses do not exceed the amounts estimated to be reasonably necessary to provide these services to the police jurisdiction. No license fee charged to any business within the police jurisdiction, but outside the city limits, shall be more than one-half of the license fee charged to a similar business within the city limits. Such ordinances shall be presumed to be reasonable and the burden shall be upon the business challenging the license fee charged to it to prove that such license fee is unreasonable or that the ordinance was illegally adopted or is violative of the statutory or fundamental law of the United States or the State of Alabama.”
541 So.2d at 532 (emphasis added).
Focusing on the emphasized portions of the above-quoted language in Reynolds Metals, Dixon Campers maintains that a municipality must first project its expenditures on behalf of the police jurisdiction and that only then may a municipality levy a tax on businesses in the police jurisdiction. In essence, Dixon Campers argues that a municipality is required to take specific formal steps in the budgeting process before it can levy a tax in the police *142 jurisdiction; it says those steps are necessary to ensure that the tax will function solely as an offset of the municipality’s expenses rather than as a method of raising general revenue.
Dixon Campers argues that the testimony of the mayor, the City’s finance director, the City’s budget officer, and the president of the city council established without dispute that the City’s budgeting process included no calculation of the expense-to-revenue relationship that, it claims, is required by Reynolds Metals. It contends that the after-the-fact expense allocation made by Dr. Thompson, the City’s expert witness, does not cure the City’s failure to have made such an allocation before it levied the taxes at issue here. Finally, Dixon Campers asserts that because the City violated the procedure called for in Reynolds Metals, the business-license taxes were for general revenue purposes and, therefore, void.
Dixon Campers points to language in this court’s opinion in State Department of Revenue v. Taft Coal Sales & Associates, Inc., supra, to support its argument that a tax is invalid under § 11-51-91 unless the taxing authority has first estimated the cost of the services it renders to the police jurisdiction. The taxpayer in Taft Coal Sales argued that the decision in Reynolds Metals required the City of Hoover to estimate the cost of services provided to the police jurisdiction before it imposed a use tax on a business in the police jurisdiction. This court disagreed and distinguished Reynolds Metals by explaining that Taft Coal Sales was a case arising under § 11-51-206, Ala.Code 1975, which authorizes a municipality to levy sales and use taxes within the police jurisdiction. In contrast to the taxes authorized by § 11-51-91 that were the subject of the decision in Reynolds Metals, the sales and use taxes authorized by § 11-51-206 are revenue-generating measures. See City of Hoover v. Oliver & Wright Motors, Inc., 730 So.2d 608 (Ala.1999). In Taft Coal Sales, this court stated, “The issue in this appeal is whether a municipality is also required to estimate the cost of services provided within its police jurisdiction before imposing the use tax authorized by § 11-51-206, Ala.Code 1975.” 801 So.2d at 840 (emphasis added).
Dixon Campers also cites City of Hueytown v. Burge, supra, overruled in part by Reynolds Metals, and Town of Eclectic v. Mays, supra, for the proposition that when a municipality makes only an after-the-fact attempt to correlate its license taxes or fees with the cost of rendering services, the taxes or fees are invalid. Dixon Campers contends that the following facts recited in the supreme court’s opinion in Burge indicate that the circumstances in that case are indistinguishable from the circumstances present here:
“Not only do the police and fire department expense records themselves fail to distinguish between in-city and police jurisdiction services, but the testimony of the mayor and the fire and police department heads establishes as a fact that in projecting their budgetary requirements no consideration has been given to the differences between the cost of rendering services to police jurisdiction businesses and those offered to others.”
342 So.2d at 343.
In Town of Eclectic v. Mays, supra, the supreme court held that, to the extent that revenues collected from a town’s garbage-service fees exceeded the cost of providing the garbage service, the fees were used to provide revenue for the town and were, in reality, a form of tax. Addressing the town’s argument that “its lack of efforts to relate revenues generated by the garbage service fees to the expenses of the garbage *143 system [were] irrelevant, if the fee structure for the garbage service later prove[d] to be reasonable,” 547 So.2d at 103, the court stated:
“To hold as Eclectic argues would, at a practical level, allow a municipality to arbitrarily and capriciously charge for its garbage services, limited only by its ability later on to devise ways to spend the revenues generated, if the service fee is challenged. Thus, allowing a municipality’s rationalizations for its fee structure, first conceived after the imposition of the fee, to sustain the fee structure would contravene the policy of permitting the municipality to charge only for the reasonable costs of the service. Accordingly, Eclectic’s argument fails, because, before imposing the garbage service fee, Eclectic should have related the fee to the cost of providing the service.”
547 So.2d at 103-04 (emphasis added).
The City argues that Burge and Town of Eclectic are both inapplicable — Burge, because it was partially overruled by Reynolds Metals, and Town of Eclectic, because it is not a case arising under § 11-51-91. Although we do not accept the City’s argument that Burge has no continuing vitality after Reynolds Metals, and although we are not convinced that Town of Eclectic is not at least somewhat instructive by analogy, we conclude that both cases are distinguishable on the merits and do not dictate the result for which Dixon Campers argues.
Burge is distinguishable because the testimony of the city officials in that case indicated not only that they had failed to undertake a formal assessment, during the budgetary process, of the cost of rendering services to the police jurisdiction, but also that they had made absolutely “no effort to relate the fees to, the reasonable cost of supervision.” 342 So.2d at 344 (emphasis added). In the present case, Mayor Dow’s testimony indicates that, although the cost of the services the City rendered to the police jurisdiction had never been isolated or specifically allocated during the budgeting process, the mayor was aware that state law required a municipality to see that “service levels” in the police jurisdiction were “up to” the revenue received from the police jurisdiction; that a 1991 audit had approved the City’s existing expense-to-revenue ratio; and that the may- or had resolved to increase the services to the police jurisdiction each year in order to be “in line with” the formula approved by the State auditor. Moreover, in contrast to Burge, there was, in the present case, no evidence indicating that the City had received complaints concerning the inadequacy of the services provided in the police jurisdiction.
Town of Eclectic is distinguishable, among other reasons, because in response to a request for admissions, the town admitted that the garbage-service fee was to provide general revenue for the town, 547 So.2d at 104, and acknowledged that it made “ ‘no effort to anticipate the cost of providing the garbage pickup service’ ” before it raised the rates for the service, 547 So.2d at 103.
Having determined that Burge and Town of Eclectic are distinguishable, we return to the standard enunciated in Reynolds Metals. In that case, our supreme court provided only the most general of guidelines:
“A municipality must estimate the amount reasonably necessary to provide for the protection of the lives, health, and property of businesses and residents, and for the maintenance of good order and the preservation of public morals within its entire police jurisdiction. The municipality may then, by a properly adopted ordinance or resolu *144 tion, set a license fee for businesses within its police jurisdiction....”
541 So.2d at 532 (emphasis added).
During oral argument on the parties’ cross-motions for a summary judgment, Dixon Campers argued that the City had not performed the kind of “estimate” contemplated by Reynolds Metals because the City had not projected specific line-item budget numbers for various police-jurisdiction services. The City responded by arguing that Mayor Dow’s testimony, when considered in its entirety, indicted that there had been the kind of estimate contemplated by Reynolds Metals. Specifically, the City pointed to the following testimony: the mayor was aware that state law required a municipality to see that “service levels” in the police jurisdiction were “up to” the revenue received from the police jurisdiction; a 1991 audit had approved the City’s existing expense-to-revenue ratio; and the mayor had resolved to increase the services to the police jurisdiction each year in order to be “in line with” the formula approved by the State auditor.
A fair reading of Reynolds Metals indicates that our supreme court did not mandate any specific formal steps that a municipality had to undertake in the budgeting process before it could levy a tax in the police jurisdiction. That said, however, it is reasonable to believe that our supreme court recognized that the term “estimate” would have different meanings in different contexts — that a process of estimation that would be appropriate for one municipality might be wholly inadequate for another. For example, a municipality whose police jurisdiction extends over an area of one square mile, contains four businesses, and has experienced no appreciable growth in recent years will be able to estimate fairly easily and quickly the likely cost of the municipal services it will provide in the police jurisdiction for the coming year. On the other hand, a major metropolis with a sprawling police jurisdiction whose population has been burgeoning in recent years and includes dozens of new residential subdivisions and hundreds, if not thousands, of businesses may not be able to estimate the cost of the services it will be called upon to render in the police jurisdiction without a more extensive analysis.
Based on those parts of the mayor’s testimony to which the City pointed in support of its argument that it had made the estimate required by Reynolds Metals, we cannot say that the City of Mobile made no effort to relate the taxes charged to the cost of services provided. However, based on the testimony of Dr. Thompson, the City’s economic expert, neither can we say that the effort the City did make was adequate under the circumstances. Dr. Thompson asked rhetorically, “So how do you estimate [the cost of services] in the future?” He answered, “You can’t. You can only do what I did and estimate [the future expenses based on what] the past [expenses have been].” (Emphasis added.)
Testimony that the last audit revealing the expense-to-revenue ratio had been performed in 1991 and that, in the interim, the population of the police jurisdiction had increased greatly makes the absence of any testimony that the mayor — or any other City official — checked to see what the City had spent on services in the police jurisdiction for the previous year, or the previous three years, particularly noticeable.
We conclude that, in opposition to the City’s motion for a summary judgment, Dixon Campers presented substantial evidence indicating that the City had not satisfied the standard set out in Reynolds Metals. Dixon Campers, therefore, met its burden to establish that there was *145 a genuine issue of material fact regarding whether the annual business-license tax was “unreasonable or that the [taxing] ordinance was illegally adopted or is violative of the statutory or fundamental law of the United States or of the State of Alabama.” Reynolds Metals, 541 So.2d at 532.
II. The Partial Denial of Class Certification
The Alabama Supreme Court has set out the following standard of review with respect to the certification or the denial of certification of a class:
“The trial court is endowed with a substantial amount of discretion in determining whether to certify a class, and [an appellate court] will not disturb its determinations without a showing [that the trial court exceeded the limits of its discretion]. Ex parte Holland, 692 So.2d 811, 814 (Ala.1997). In determining whether certification [or the refusal to certify] was proper, we consider whether the party seeking certification produced substantial evidence satisfying the requirements of Rule 23(a), Ala. R. Civ. P.”
Atlanta Cas. Co. v. Russell, 798 So.2d 664, 666 (Ala.2001). Rule 23(a), Ala. R. Civ. P., provides:
“Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.”
“These four requirements are commonly referred to respectively as (1) ‘numerosity,’ (2) ‘commonality,’ (3) ‘typicality,’ and (4) ‘adequacy.’ ‘Numerosity and commonality concern the entire class, while typicality and adequacy concern the nexus of the named class representatives with the class itself.’ ”
Atlanta Cas. Co. v. Russell, 798 So.2d at 666 (quoting Warehouse Home Furnishing Distribs., Inc. v. Whitson, 709 So.2d 1144, 1148 (Ala.1997)). “[F]ederal case law on class actions [is] persuasive authority for the interpretation of our own Rule 23. Adams v. Robertson, 676 So.2d 1265 (Ala.1995), writ dismissed, 520 U.S. 83, 117 S.Ct. 1028, 137 L.Ed.2d 203 (1997).” Warehouse Home Furnishing Distribs., Inc. v. Whitson, 709 So.2d at 1148.
A. Standing
The trial court found that “Dickson Campers, as well as most other potential class members, pass[es the monthly gross-receipts taxes] on to the consumer.” Therefore, the trial court held, “Dickson Campers does not have standing to proceed with a certification for a class consisting of business entities which paid these monthly gross receipts taxes.”
“Whether the named plaintiff[ ] ha[s] standing to assert [its] claims ... is a threshold legal issue subject to de novo review.” Griffin v. Dugger, 823 F.2d 1476, 1482 (11th Cir.1987). In order to establish that it has standing, the named plaintiff must show that
“(1) it has suffered an ‘injury in fact’ that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.”
Pittman v. Cole, 267 F.3d 1269, 1282 (11th Cir.2001).
*146 If a tax is levied on a retailer and the retailer may, but is not statutorily required to, pass the tax along to the consumer in the form of a price increase, then the levy is a tax on the retailer. See City of Mobile v. M.A.D., Inc., 684 So.2d 1283, 1288 (Ala.1996). See also City of Prichard v. Hawkins, 255 Ala. 676, 680, 53 So.2d 378, 381 (1951):
“The so-called license tax levied by the ordinances here under attack ... was levied against the operator of the filling or service station. The fact that the operator of the service station passed the tax on to the customer would not in and of itself deprive him of the right to recover, in an action for money had and received, payments made by him under a void ordinance.”
Moreover, even if Dixon Campers had been statutorily required to pass the tax along to the consumer, as in the case of a true sales tax,[4] it would have had standing to challenge the validity of the tax. See City of Hoover v. Oliver & Wright Motors, Inc., supra:
“In order to have standing, a plaintiff must have a real, tangible interest in the subject matter of the lawsuit. Eagerton v. Williams, 433 So.2d 436 (Ala.1983). ‘ “In Alabama, although retail sales tax is levied against the ultimate consumer, the burden is on the seller to collect from the purchaser the amount of the tax due on a sale, and the State looks to the seller for the tax.” ’ In re Peiffer, 126 B.R. 364, 367 (Bankr.N.D.Ala.1991)(quoting Merriwether v. State, 252 Ala. 590, 593, 42 So.2d 465, 466 (1949)). ... [T]he imposition upon [the retailer] of the burden to calculate, collect, and remit the tax under penalty of liability for any errors provides it with standing to challenge the constitutionality of the law that imposes the burden.”
730 So.2d at 611. We conclude that Dickson Campers established that it had suffered an injury in fact traceable to the imposition of the City’s monthly gross-receipts tax. We therefore hold that the trial court erred in determining that, because Dickson Campers had added the amount of the monthly gross-receipts tax to the cost of the goods it sold and collected from its customers in the form of a price increase, it did not have standing to assert its claims against the City.
B. Typicality
The trial court also held that “Dixon Campers’ claims are not typical of the class and its interests may conflict with other potential class members who may not have passed on the tax on a regular basis.”
“The issue of adequacy of representation is not one of standing. ‘As long as the representative parties have a direct and substantial interest, they have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation.’ ”
Cutler v. Orkin Exterminating Co., 770 So.2d 67, 69-70 (Ala.2000)(quoting 7B Charles Alan Wright et al., Federal Practice & Procedure § 1785.1 at 141 (2d ed.1986)).
In Ex parte Government Employees Insurance Co., 729 So.2d 299 (Ala.1999), a Governmental Employees Insurance Com *147 pany (“GEICO”) policyholder filed a class-action complaint challenging as a violation of the uninsured-motorists (“UM”) statute an offset provision of the GEICO automobile insurance policy that required a reduction in benefits payable to the insured under the UM coverage for any amount that had been paid to the insured under the medical-payments coverage. The Alabama Supreme Court held that the typicality requirement was “satisfied by a common question — whether the setoff provision of GEICO’s contract with its policyholders violates Alabama law.” 729 So.2d at 308-09.
In Cheminova America Corp. v. Corker, 779 So.2d 1175 (Ala.2000), the purchasers of a skin-care product filed a class-action complaint against the manufacturer, distributor, and a retailer of the product, alleging that the product contained a dangerous unlabeled ingredient. One of the named class representatives purchased the product directly from the distributor; another purchased the product from her local drug store. The supreme court held that “variations in the degree of privity the separate class members had with the defendants” did not defeat the typicality requirement. 779 So.2d at 1180.
“ ‘Where, as here, “the party seeking certification alleges that the same unlawful conduct was directed at the class representatives and the class itself, the typicality requirement is usually met irrespective of the varying fact patterns which underlie individual claims.” See Appleyard v. Wallace, 754 F.2d 955, 958 (11th Cir.1985). In this case the varying fact patterns that underlie Plaintiffs’ claims do not change the result. The specific differences [in privity] highlighted by the Defendants are distinctions without a difference.’ ”
779 So.2d at 1180-81 (quoting the trial court’s order) (brackets and emphasis added).
Dixon Campers has allegedly been injured in the same manner and by the same conduct as the class it sought to represent. The claims of Dixon Campers and the claims of the potential class of businesses operating in the police jurisdiction that paid monthly gross-receipts taxes arise out of the same conduct by the City — the imposition of monthly privilege or license taxes that are allegedly invalid under § 11-51-91. This alone is sufficient to satisfy the typicality requirement. Compare Avis Rent A Car Sys., Inc. v. Heilman, 876 So.2d 1111, 1118 (Ala.2003)(holding that the circumstances under which the named class representatives contracted with the rental company were not typical of the purported class of rental customers because a significant percentage of the rental customers were corporations and corporate travelers who either did not sign rental documents or whose contracts did not call for the fees paid by the named class representatives. “Otherwise stated, the alleged injuries of the named representatives are premised on facts and relationships fundamentally different than those involving many of the class members they seek to represent.”).
Granted, some of the class members may have paid, in addition to the monthly gross-receipts tax that Dixon Campers paid, additional monthly taxes on liquor, lodging, or cigarettes, for example, that Dixon Campers was not required to pay because of the nature of the business in which it was engaged, but all businesses paid monthly license or privilege taxes levied as a consequence of their doing business in the police jurisdiction. “ ‘[Typicality] may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other *148 class members.’ ” In re Synthroid Marketing Litig., 188 F.R.D. 287, 291 (N.D.Ill.1999) (quoting De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir.1983)). See Andrews v. American Tel. & Tel Co., 95 F.3d 1014, 1022 (11th Cir.1996)(holding that class representatives “need not have participated in a wide variety of 900-number programs to have suffered harm typical of the harm suffered by the class members in general”). The typicality requirement is satisfied when the putative class representative alleges that the same unlawful conduct affected both the class representative and the class itself, notwithstanding variations in the amount of damages. See Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1337 (11th Cir.1984)(stating that “[d]iffer-ences in the amount of damages between the class representative and other class members does not affect typicality”).
As we have previously discussed, the monthly gross-receipts taxes were imposed on the businesses in the police jurisdiction, not on the ultimate consumers, and all of the businesses had the burden of calculating, collecting, and remitting the taxes to the City, see City of Hoover v. Oliver & Wright Motors, Inc., supra. Whether the businesses passed on the taxes to their customers or not, they all had the same legal claims against the City based on the same allegation that the taxes were invalid. Therefore, the trial court erred by determining that the interests of Dixon Campers may have “conflict[ed] with other potential class members who may not have passed on the tax on a regular basis.” Compare Cutler v. Orkin Exterminating Co., 770 So.2d at 71 (holding that “[t]he absence of an arbitration clause in the contracts executed by [the named representatives of the class] could present a conflict of interest between them and [other potential class members], because the relevant questions of law ... dealing with the availability of the contractual provision for arbitration are not applicable in the same manner to each member of the class”).
Dixon Campers presented substantial evidence satisfying the requirements of Rule 23(a), Ala. R. Civ. P. The trial court exceeded the limits of its discretion by refusing to certify a class composed of business entities in the police jurisdiction that paid the City’s monthly gross-receipts taxes.

Conclusion

Because there remains a genuine issue of material fact regarding whether the annual business-license tax was “unreasonable or that the [taxing] ordinance was illegally adopted or is violative of the statutory or fundamental law of the United States or of the State of Alabama,” Reynolds Metals, 541 So.2d at 532, the trial court’s judgment that the City did not violate § 11-51-91 by levying an annual business-license tax on the businesses operating in the police jurisdiction is reversed.
The trial court’s order denying Dixon Campers’ motion to certify a class composed of business entities in the police jurisdiction that paid the City’s monthly gross-receipts taxes is also reversed, and the cause is remanded for further proceedings.
REVERSED AND REMANDED.
THOMPSON, P.J., concurs.
BRYAN, J., concurs in the rationale in part and concurs in the result, with writing.
MOORE, J., concurs in the result, without writing.
PITTMAN, J., dissents, with writing.

. An order refusing to certify a class is immediately appealable. See § 6-5-642, Ala.Code 1975. However, "the failure to file an appeal ... shall in no way affect the right of any party, after the entry of final judgment, to appeal the earlier ... refusal to certify[ ] the class." Id.

. October 1, 2003, was the effective date of Mobile Municipal Code § 34-033 (2003), which converted the gross-receipts privilege or license tax into a true sales and use tax. See § 11-51-206, Ala.Code 1975 (authorizing a municipality to levy sales and use taxes within its police jurisdiction).

. Although the total revenue received from all business-license taxes in the police jurisdiction exceeded the cost of the municipal services rendered to the police jurisdiction for *141 2002 and 2003, the trial court apparently believed that, because it had certified a class of those entities that had paid the annual business-license taxes, it was required to compare only the revenue from the annual business-license taxes to the cost of services. Dixon Campers makes no argument on appeal that the trial court compared the wrong figures.

. "[S]ales taxes are of two types. One is a ‘gross receipts’ tax which may be, but is not required to be, passed on to the ultimate consumer. The other type is a true sales tax which must be added to the purchase price and passed on to the consumer.” McElrath Poultry Co. v. State Dep't of Revenue, 332 So.2d 383, 384 (Ala.Civ.App.1976).